# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

ULIOUS BROOKS,

       Plaintiff,

    v.

SGT MIKE DILLOW, et al.,

       Defendants.

Case No. 1:15-cv-812

Black, J.

Bowman, M.J.

## REPORT AND RECOMMENDATION

### I.    Background

Plaintiff, an SOCF inmate, is an experienced litigant. He has filed two petitions for writ of habeas corpus and, with the addition of a complaint filed May 19, 2016, five civil suits in this Court concerning conditions of his confinement, as well as numerous lawsuits in state court.[1] Representing on the face of his complaint form that he had not filed any other lawsuits relating to his imprisonment,[2] Plaintiff initiated the instant lawsuit, proceeding *pro se* and *in forma pauperis*, on December 22, 2015. Upon initial

---

[1] *See* Case No. 1:16-cv-564 (civil rights)), Case No. 1:15-cv-39 (civil rights, Doc. 43 at 4, noting that Plaintiff "has filed numerous cases in both this Court and the [Ohio] Court of Claims."); Case No. 1:10-cv-953 (denying petition for writ of habeas corpus that sought to overturn conviction on a third-degree felony charge of attempted felonious assault on a correctional officer at SOCF); Case No. 1:09-cv-922 (civil rights); Case No. 1:14-cv-475 (habeas corpus); Case No. 1:10-cv-77 (civil rights); Case No. 1:15-cv-812 (civil rights).

[2] The form used by Plaintiff specifically inquired whether he had begun other lawsuits in state or federal court dealing with the same facts involved in this action <u>or otherwise relating to your imprisonment?</u> Plaintiff incorrectly responded "no." (PageID 38). The Prison Litigation Reform Act generally bars prisoners from filing additional lawsuits if they have filed three or more prior suits that have been dismissed as frivolous or for failure to state a claim. Although Plaintiff inappropriately represented that he had not filed prior litigation, he also attached an "Affidavit" to his complaint in which he acknowledged filing a series of cases in state and federal courts over the past five years. (Doc. 3, PageID 58).

screening, the undersigned recommended dismissal of all claims with the exception of a single claim against Defendant Sgt. Dillow, based on allegations that Sgt. Dillow used excessive force against Plaintiff on November 24, 2015.  In January 2016, Plaintiff amended his complaint to add a sexual harassment claim against a new Defendant, Correctional Officer Spradlin, but the Court thereafter granted Defendant Spradlin's motion to dismiss.  Plaintiff's claims against Defendant Dillow, including new allegations in the amended complaint regarding a "retaliatory transfer" claim, remain pending.

Throughout this litigation, Plaintiff has kept up a frenetic pace of filing what have frequently been determined to be frivolous and/or procedurally improper documents and motions.  (*See generally* Doc. 60).  As of the date of this Report and Recommendation ("R&R"), the Court has before it a dozen motions filed by Plaintiff, including two motions for summary judgment.

In addition to Plaintiff's motions, on August 25, 2016, Defendant Dillow filed a counter-motion for summary judgment. Defendant's motion argues that the two claims against him are procedurally barred, based upon Plaintiff's failure to administratively exhaust those claims.  For the reasons stated herein, the undersigned recommends that Plaintiff's motions for summary judgment be denied and that Defendant's motion be granted, with all remaining pending motions to be denied as moot.

## II.    Factual Allegations of Plaintiff's Complaint

In the complaint filed on January 19, 2016, Plaintiff relates a history of animosity between Sgt. Dillow and himself.  On November 24, 2015, Plaintiff alleges that he had briefly returned to his cell from a period of administrative segregation, but that the Defendant appeared at Plaintiff's cell a few hours later in order to escort him back to

2

"the hole" for an unspecified reason.[3]  After cuffing Plaintiff and leading him to a nearby stairway, Defendant allegedly pointed to a camera and told Plaintiff that he would have pushed him down the stairs if it wasn't for the camera.  (Doc. 3, PageID 41).  Plaintiff's complaint further alleges:

> I blew him off, and turned around to [illegible] his threats.  He then ran up the stairs around me, and get in my face, and called me a "Bitch."  I called him a "Bitch" back.  Then I told him the only reason why I won't put my hands on him [is] because I know he would set me up!  I also told him how tired I was using self control around him because he always disrespects me like I'm a child.  He then became very angry then grabbed me by the base of my shirt then forcefully rammed me agenst [sic] the wall on the 3rd step on K-3 41 through 80 side of the unit.  He then began threatening me again.  Then he forcefully pushed me and rushed me down the stairs, and forcefully pushed me into the hallway agenst [sic] my own liberty even though I was not resisting, or causing him a threat.  (I could have walked on my own, but he did not let me!)  He then forcefully rammed me against another wall inside of the hallway, then threatened to slam me on the floor, and beat me up!  (I was in handcuffs and shackles the whole time!)  He the[n] began forcefully pushing me down the long K-side hallway on into the hole on unit S-2.  He deprived me of my own liberty to walk on my own by pushing me.  I did nothing at all to make him hate me and do this to me.  He just have a deep personal driven hatred against me because of the type of person I am.  When I went to the hole, R.I.B. convicted me but the warden reversed and overturned my ticket while I was in the hole a staff member told me that Sgt. Dillow is going to get me moved to Unit K-1 or K-2.  Just in case I file a lawsuit he will be able to retaliate easier.  Once I was let out the hole on 12-7-15 I was moved back to Unit K-3.  The very next day early in the morning Sgt. Dillow personally came to my cell, which was unit K-3 cell 80 with handcuffs, and shackles.  He then made me pack my cell up, then he escorted me to unit K-1 to cell 76.  He then told me "I put you where I want you.  And if you file any paperwork about what happen I can get you touched over here!"  He called himself threatening me, but I'm not going to let his threats stop my lawsuit.  Since I have been on Unit K-1 I been getting repeatedly harassed by these C-O's.

---

[3]Plaintiff alleges that he was being moved to another cell block for "no reason" while Defendant has offered evidence that Plaintiff was relocated from one cell to another due to Plaintiff's refusal to stop masturbating.  (*See e.g.*, Doc. 58-3). There is no need for this Court to resolve this small factual dispute, since the reason for the move is not material to the pending dispositive motions.

(PageID 41, 43)  Plaintiff's claims against Dillow included a claim of excessive use of force based upon Dillow's alleged actions in "ramming" Plaintiff against two walls during the escort, as well as in pushing him "forcefully" forward during the escort without allowing Plaintiff to walk at his own pace.

Plaintiff attached to his complaint the conduct report filed by Sgt. Dillow regarding his use of force on November 24, 2015.  In that report, from which Plaintiff was charged with two rules infractions, Sgt. Dillow describes the incident as follows:

> I went…to escort [Plaintiff] to J2.  At this time I placed the handcuffs on him and at this time I noticed there was an unknown liquid on the bars and the floor in front of his cell so at this time I then ordered to have his cell opened and then I would place the leg Irons once we got to the steps. Once Inmate Brooks was on the third step, I gave him a direct [order] to turn around so that leg Irons could be applied.  Be advised at this time Inmate Brooks began yelling and got in my face aggressively.  At this time I gave him a direct order to turn around and be advised Inmate Brooks didn't comply.  At this time I Sgt. Dillow then placed him to the front and at this time I then applied the leg Iron on.  At this time I then escorted him out of the block while I had my left hand on his left arm and my right hand on his shoulder.  As I was escorting him in K-Corridor Inmate Brooks was still being loud and aggressive and wanted to keep turning towards me.  I gave him a direct order to hold it down and to not turn towards me.  Be advised Inmate Brooks didn't comply with my order and then turn[ed] towards me, at this time I reacted to his actions and then placed him on the wall and then I gave him a direct order to calm down.  At this time Inmate Brooks then calmed down and I proceeded to …escort him to J2. No other force was used.

(Doc. 3, PageID 49-50).

It is apparent from the conduct report that Defendant admits to forcefully "plac[ing]" Plaintiff on two occasions during the escort to segregation, after Plaintiff failed to comply with verbal commands.  Defendant also admits to physically holding Plaintiff with Defendant's "left hand on his left arm and my right hand on his shoulder"

during the escort.  Thus, there is relatively little dispute concerning the force used by Defendant during Plaintiff's escort on November 24, 2015.

Plaintiff alleges that when he went before the Rules Infraction Board for his hearing on the conduct report:

> I guess they used D.V.R. #517-15 as their evidence about what occurred on the stairs on Unit K-3.  Theirfore [sic] they should have seen him slam me up against the wall.  But they neglected me by overlooking me getting assaulted, and they found me guilty anyway even though my conduct report was not written up right, with no rule violations ect. [sic].  My conduct report was later reversed by the warden.  But still no one acknowledged or addressed me being assaulted on the stairs.

(Doc. 3, PageID 47).  The initial RIB disposition found that Plaintiff violated Rules 20 and 21, based upon the conduct report.  (*Id.*, PageID 52).  However, Plaintiff successfully appealed that disposition, and the Warden reversed his conviction for the rules violations.  (*Id.*, PageID 53).

On January 25, 2016, Plaintiff sought leave to file an amended complaint in which he alleged that after being moved to Unit K-1, his mail was tampered with, he was denied access to razors, and correctional officers were verbally abusive.  (Doc. 10-1, PageID 94-95).  Although the Court disallowed any claim of retaliation on initial review, the Court permitted an amended retaliation claim based upon the new allegations. "[O]ut of an abundance of caution in light of additional allegations of mistreatment <u>since his transfer to Unit K-1, including tampering with his incoming mail</u>, plaintiff may proceed at this juncture with a 'retaliatory transfer' claim against defendant Dillow."  (Doc. 11, PageID 111, emphasis added).

### III.     Pending Motions for Summary Judgment

### A.  Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A dispute is "genuine" when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248-49.  The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the nonmoving party.  *Id.* at 252.

Plaintiff seeks summary judgment on both his excessive force and his retaliation claims.  In his response, Defendant has offered probative evidence that fully refutes Plaintiff's minimal production of evidence, and proves that Defendant is instead entitled to judgment as a matter of law.  Defendant also has filed his own motion for summary judgment based upon Plaintiff's failure to fully exhaust his administrative remedies prior to filing this lawsuit.

6

Defendant's procedural motion will be addressed first. However, because the undersigned concludes that only the retaliation claim is subject to dismissal for failure to exhaust, the undersigned proceeds to the merits of Plaintiff's excessive force claim.

### B. The PLRA's Exhaustion Requirement

Defendant's motion argues that he is entitled to judgment based upon the Plaintiff's failure to fully exhaust his administrative remedies as required under the PLRA. Before a claim may be filed by a prisoner under 42 U.S.C. § 1983, the plaintiff must have fully exhausted the same claim in the administrative process afforded him under state law. *See* 42 U.S.C. §1997e(a); *Porter v. Nussle*, 534 U.S. 516, 524 (2002) The PLRA's exhaustion requirement is "mandatory," with the steps to exhaustion defined by the prison's grievance process. *Jones v. Bock*, 549 U.S. 199, 211 (2007) (citing *Porter*, 534 U.S. at 524). However, an inmate need only exhaust "available" remedies under the statute, not unavailable ones. *Ross v. Blake*, 136 S. Ct. 1850, 1858, 195 L. Ed. 2d 117 (2016)

Ohio has established a three step process to address inmate complaints. Ohio Admin. Code 5120-9-31(A). The first step allows an inmate to file an informal complaint to the direct supervisor of the staff member responsible for the inmate's complaint. O.A.C. 5120-9-31(K)(1). An inmate who is dissatisfied with the supervisor's response to his Step 1 grievance must proceed to Step 2 by obtaining and completing a Notification of Grievance form. O.A.C. 5120-9-31(K)(2). The grievance must be filed within fourteen days from the date of the denial of the informal complaint, and the Institutional Inspector must respond in writing. If still dissatisfied, in order to fully exhaust the inmate must proceed to Step 3 of the grievance procedure by requesting an additional appeal

7

form.  O.A.C. 5120-9-31(K)(3).  This third step appeal must be filed with the Office of the Chief Inspector within fourteen days of the date of the prior denial.

"When a prisoner fails to exhaust his administrative remedies before filing a civil rights complaint in federal court, or only partially exhausts administrative remedies, dismissal of the complaint is appropriate."  *Hopkins v. Ohio Dep't of Corrections*, 84 Fed. Appx. 526, 527 (6th Cir. 2003).  Because exhaustion is an affirmative defense, the Defendant bears the burden of proving that Plaintiff failed to properly exhaust.  *Napier v. Laurel Cnty., Ky.*, 636 F.2d 218, 225 (6th Cir. 2011).

## 1.  Steps Taken To Exhaust Plaintiff's Excessive Force Claim

Plaintiff clearly complied with Step 1 of the three-step grievance process by filing an informal grievance called an Informal Complaint Resolution ("ICR") against Defendant Dillow, alleging that Dillow used excessive force against him.  (Doc. 3, PageID 47-48).  However, Defendant argues that Plaintiff failed to fully exhaust that claim, because he did not complete the second and third steps of the grievance appeal process.  Plaintiff asserts in his response that he exhausted all "available" remedies because he was denied a Step 2 grievance form, and alternatively, because he completed Step 3.

Plaintiff's Step 1 ICR grievance bears the date of the incident, November 24, 2015, and alleges that Dillow and Plaintiff became engaged in a verbal altercation.  That verbal altercation allegedly escalated to Dillow using excessive use of force, by "ramming" and/or "slamming" Plaintiff into the wall in the course of transporting Plaintiff to the hole, and "forcefully" taking Plaintiff down the hallway with a "tight grip onto the

back of my shirt." (Doc. 3, PageID 54). In relevant portion, the ICR relates the incident as follows:

> So I called him a bitch and disrespected him back verbally. Then he became extremely angry, and rushed forced me [against] the wall on the stairs, after grabbing onto the back of my shirt. He then became verbally disrespectful towards me [illegible], and threatened to slam me to the floor. He then rushed me by force into the hallway, and slammed me [against] the wall and threatened to slam me to the floor and cursed me out again. He then forcefully rushed me down the hallway to unit J-2, while he had a tight grip onto the back of my shirt. There was no need for him to force me [against] none of the walls, or to force me to walk down the [illegible]. I was in handcuffs and shackles [against] my own liberty to wear. I was not resisting. He forced me up the hallway using excessive use of force. I was in handcuffs, and shackles the whole time.

(*Id.*).

After his informal grievance was denied, Plaintiff specifically requested a Notification of Grievance ("NOG") form in order to complete a Step 2 appeal, but his request for the form was denied. (*Id.*, PageID 48).

Plaintiff attached to his complaint a copy of his written request for "a grievance form on the I.C.R. I wrote on Sgt. Dillow on 11-24-15 from when he assaulted me on Unit K-3." (Doc. 3, PageID 55).[4] In a response dated December 9, 2015, Institutional Inspector L. Mahlman denied Plaintiff's request for the form, stating: "Conduct Report SOCF 15-003521 per AR 5120-9-31 is <u>Not</u> grievable." (*Id.*, emphasis original).

Based upon Inspector Mahlman's response, Plaintiff argues that he exhausted all "available" remedies. Her response denies his explicit request for an appeal form and instead instructs him to appeal "through the Rules Infraction Board process." (Doc. 61,

---

[4]In the same request, Plaintiff sought an additional NOG form to appeal the denial of his ICR against Correctional Officer Spadlin. That form was provided, and Plaintiff fully exhausted that claim.

PageID 409).  In a separate affidavit,[5] Plaintiff reiterates that he was rebuffed in his attempt to appeal the ICR because he was "told…[that] I must appeal my excessive use of force claim through the Rules Infraction Board (R.I.B.) process.  I complied and did so, and my R.I.B. conviction was overturned by the warden." (Doc. 63, PageID 424). Thus, Plaintiff argues that Mahlman thwarted his good faith efforts to exhaust his excessive force claim other than through the RIB process.

Defendant disputes Plaintiff's contention that he exhausted "available" remedies. Defendant describes Plaintiff as "highly experienced in the inmate grievance process," having filed a total of 168 complaints through the institutional grievance system since December 2008. (Doc. 64-1, at ¶10).   Of twenty-four (24) grievances filed between November 24, 2015 and July 11, 2016, Defendant states that Plaintiff fully exhausted only two grievances.   Based upon Plaintiff's familiarity with the grievance process, Defendant maintains that Plaintiff should have understood that Mahlman had "misconstrued" his request for an appeal form, and either should have clarified or reiterated his request for the form.  (*See* Doc. 64, PageID 431; *see also* Doc. 64-1, Mahlman Declaration stating that she "misinterpreted" Plaintiff's request).   Defendant argues that because Mahlman's response specifically referenced only the <u>Conduct Report</u>, Plaintiff remained obligated to proceed through the three-step grievance process for his excessive force claim.

---

[5]Plaintiff has filed a number of "affidavits."  While not notarized, the documents are nonetheless considered as Declarations, to the extent Plaintiff avers that they are made under penalty of perjury.

The undersigned cannot agree.  In *Ross v. Blake*, 136 S. Ct. at 1857-1859, the Supreme Court reiterated that an administrative remedy is not "available" under the PLRA

> when prison administrators thwart inmates from taking advantage of a grievance process through machination, *misrepresentation*, or intimidation. In *Woodford* [*v. Ngo*]*,* we recognized that officials might devise procedural systems (including the blind alleys and quagmires just discussed) in order to "trip[ ] up all but the most skillful prisoners." 548 U.S. [81], at 102, 126 S.Ct. 2378. And appellate courts have addressed a variety of instances in which officials misled or threatened individual inmates so as to prevent their use of otherwise proper procedures. As all those courts have recognized, such interference with an inmate's pursuit of relief renders the administrative process unavailable.  And then, once again, § 1997e(a) poses no bar.

*Blake*, 136 S. Ct. at 1860,(footnote omitted, emphasis added).  The Supreme Court cited as examples several cases in which responses of prison officials to an inmate's attempt to comply with the administrative process was misleading.  *Id.* at n.3.  On the facts presented, the undersigned concludes that Inspector Mahlman's response to Plaintiff's request for an appeal form was sufficiently misleading so as to render "unavailable" any further administrative exhaustion of the excessive force claim.

This conclusion is consistent with *Blake*, where the inmate filed evidence to support his contention that prison officials "routinely dismiss [administrative] grievances as procedurally improper when parallel IIU [Internal Investigation Unit] investigations are pending." *Id.* at 1860-1861.  In *Blake*, prison officials had not "identif[ied] a single case in which a warden considered the merits of an [administrative] grievance while an IIU inquiry was underway."  *Id.* at 1861.  The *Blake* Court remanded for closer review of whether the administrative process had been foreclosed, given some evidence of "cases in which an inmate refused to take a warden's jurisdictional 'no' for an answer,

resubmitted his grievance up the chain to the [Inmate Grievance Office], and there received a ruling on the merits." *Id.* at 1861-1862.

No similar ambiguous evidence exists in this record. Plaintiff alleges a uniform custom or practice whereby Inspector Mahlman refuses to permit appeals of any grievance concerning an excessive force complaint against a correctional officer who simultaneously has charged plaintiff in a conduct report with a rules violation. (Doc. 65, PageID 446, Doc. 67, PageID 456). Even if there were evidence that the Institutional Inspector permitted Step 2 and Step 3 appeals on analogous facts, however, Plaintiff has demonstrated he exhausted all "available" remedies on the excessive force claim against Dillow. In response to Plaintiff's unambiguous request to appeal the denial of his excessive force grievance, Inspector Mahlman stated that the incident was not subject to the grievance procedure. Expecting Plaintiff to persist by reiterating his request in the face of this flat denial of his request to appeal is neither reasonable nor supported by controlling case law.

Defendant's reliance on the undersigned's unpublished R&R in *Willis v. Mohr*, 2013 WL 1281634 at *3 (S.D. Ohio Mar. 26, 2013) is unavailing, in part because that case is factually distinguishable. *Contra Willis,* at *6, "This is not a case where prison authorities … provided erroneous advice as to the correct procedures.," *report and recommendation adopted,* 2013 WL 1829668 (S.D. Ohio May 1, 2013), *order withdrawn,* 2013 WL 5773932 (S.D. Ohio Oct. 24, 2013), and *report and recommendation adopted,* 2013 WL 5773932 (S.D. Ohio Oct. 24, 2013).

Having determined that Plaintiff has satisfied his burden to prove that he exhausted all "available" remedies and that prison officials thwarted his attempts to

12

comply with the grievance appeal procedure provided under Ohio law, it is unnecessary for this Court to reach Plaintiff's alternative argument that, after being denied the NOG form, he exhausted by appealing directly to the Chief Inspector as provided for in Step 3.  To the extent that any reviewing court would disagree with the undersigned's conclusion in this regard, the undersigned would alternatively hold that the referenced grievance to the Chief Inspector did not serve to simultaneously exhaust the claim against Dillow.

The grievance submitted to the Chief Inspector was filed against the SOCF Warden, not Dillow.  Unlike the more typical 3-step process used for claims against nearly all other institutional employees, Ohio provides for a single-step grievance procedure for claims filed against the Warden or Institutional Inspector.  The referenced grievance criticized the Warden's lack of response to Plaintiff's "hunger strike," which action Plaintiff alleges that he undertook after the Warden failed to respond to Plaintiff's complaints against Dillow and Spradlin.  Despite allegedly being derivative of Plaintiff's original complaints, the grievance clearly focused on the Warden's failure to respond. (*See* Doc. 36-2, PageID 227, focusing on the Warden's "failure to protect").  Plaintiff himself describes the grievance as "[against] the Warden on 12-4-15 when I was in Unit J-2 cell b4 (the hole) complaining on how Sergeant Dillow put me in the hole for no reason, and how I tried to warn the Chief Inspector on how Sergeant Dillow threatened to put me on Unit K-1 once I got out of the hole." (*Id.*)  Only in response to Defendant's motion for summary judgment does Plaintiff for the first time attempt to recharacterize this same grievance as a form of appeal of the denial of his ICR against Dillow.

13

In short, the NOG filed directly with the Chief Inspector, while a valid use of the alternative one-step grievance procedure for claims against the Warden, cannot doubly serve as formal Step 2 and Step 3 appeals of the denial of Plaintiff's excessive force grievance against Dillow.  Still, because Inspector Mahlman thwarted Plaintiff's attempts to further appeal his excessive force grievance by telling him that the claim was not grievable, Plaintiff fully exhausted his available remedies for that claim.

### 2.  Steps Taken To Exhaust Plaintiff's Retaliation Claim

Defendant more persuasively argues that Plaintiff did not exhaust his retaliation claim.

Plaintiff originally complained that he was transferred from a cell in the K-3 unit to the K-1 unit as an act of retaliation.  Upon initial screening, this Court dismissed that claim as wholly frivolous, pointing out that "Plaintiff has no constitutionally protected right to a particular housing assignment within SOCF or to avoid a transfer to another prison unit."  (Doc. 5 at 5-6, collecting cases).  The Court explained that Plaintiff had failed to state a retaliation claim, because "a transfer is merely an ordinary incident of prison life.'" (Doc. 5 at 6, citations omitted).  The Court noted that "Plaintiff has not alleged any facts to suggest that his transfer from Unit K-3 to Unit K-1 fits" the type of "exceptional circumstances", including "foreseeable, negative consequences" that would "inextricably follow" and potentially state a retaliation claim.  (*Id.* at 6-7).

> Indeed, plaintiff was not deterred by the change in his housing assignment from filing a lawsuit against the defendant. The only allegation that plaintiff has made, which arguably suggests the existence of "negative consequences," is that he has been repeatedly harassed by correctional officers while housed in Unit K-1. The allegation is simply too conclusory to support the inference that the negative consequences he has experienced "inextricably follow[ed] from the transfer" or were "sufficiently

14

severe to deter a person of ordinary firmness from exercising his [First Amendment] rights." Therefore, plaintiff has not stated a viable claim under § 1983 to the extent he challenges his current housing assignment at SOCF.

(Doc. 5 at 7).

When Plaintiff sought leave to amend his complaint to reinstate his retaliation claim, this Court reconsidered - out of "an abundance of caution" – based solely upon the "additional allegations of mistreatment since his transfer to Unit K-1."  (Doc. 11 at 2). Specifically, the Court found it appropriate to permit "further development" of Plaintiff's new allegations that <u>after</u> transfer to K-1, another officer or officers (directed by Defendant Dillow) had tampered with Plaintiff's incoming mail including a birthday card sent by Plaintiff's mother but never received.  (Doc. 11, PageID 11).  Although there appears to be no evidentiary support for the merits of the claim,[6] the undersigned now recommends dismissal based upon Plaintiff's failure to administratively exhaust.

As with his excessive force claim, Plaintiff also complied with Step 1 of the three-step grievance process by filing two informal grievances, dated January 20 and February 10, 2016, concerning alleged retaliation (including the alleged mail tampering by nonparty Correctional Officer Pruitt) that occurred following Plaintiff's transfer to K-1. (*See* Doc. 58-5 at ¶¶ 11-12).  Unlike after the denial of his excessive force ICR, Plaintiff made no attempt to proceed to Step 2 or Step 3 on his retaliation claim.  (*Id.*).  None of the four responsive documents filed by Plaintiff on the issue of exhaustion, (*see* Docs.

_____

[6]Plaintiff asserts that he learned of the missing card during a telephone call with his mother on January 16, 2016.  (Doc. 36, PageID 223).  Plaintiff speculates, but offers no evidence that anyone at the prison had anything to do with the card's disappearance. Plaintiff reiterates that his retaliation claim is primarily based upon Dillow moving him from K-3 to K-1 for "no reason" and stating the move was based upon a violation of Rule 14, which Plaintiff denies.  (Doc. 36-2, PageID 228). However, the transfer from K-3 to K-1 for "no reason" claim differs from the amended claim that was permitted to proceed..

15

61, 63, 65, 67), refute Defendant's unequivocal evidence that Plaintiff failed to exhaust his retaliation claim.

For the reasons stated, Defendant is entitled to summary judgment on the unexhausted retaliation claim, and Plaintiff's motion for summary judgment on that claim should be denied.

### C. The Merits of Plaintiff's Excessive Force Claim

Because the procedural exhaustion issue does not foreclose Plaintiff's excessive force claim, the undersigned now turns to the merits of that claim. Plaintiff has filed a motion for summary judgment advocating for judgment in his favor, (Doc. 36), while Defendant has filed a substantive response that is hereby construed as a counter-motion.[7] Despite being unpersuaded by the Defendant's arguments on the exhaustion issue, the undersigned recommends that summary judgment be granted to Defendant Dillow on the merits of the excessive force claim.

In order to show a violation of the Eighth Amendment, a plaintiff must prove both an objective component and a subjective component of his claim. *See Santiago v.*

---

[7]Defendant Dillow's formal motion for summary judgment limits argument to the procedural ground of Plaintiff's alleged failure to exhaust. However, Defendant's response is hereby broadly construed as raising the substantive argument that Defendant is entitled to judgment on the merits of the excessive force claim. Plaintiff fully responded to the arguments on the merits by filing multiple reply memoranda and affidavits in support of his own dispositive motions; therefore, there is no prejudice to Plaintiff from this construction of Defendant's response. To the extent that a reviewing court may disagree, Plaintiff is provided an additional opportunity for *de novo* review of any objections to this recommended disposition of the merits of his claims. The Sixth Circuit permits a district court to grant a motion for summary judgment on grounds not urged by the parties "so long as 'the losing party was on notice that it had to come forward with all of its evidence [and has a] reasonable opportunity to respond to all the issues to be considered by the court.'" *Bennett v. City of Eastpointe,* 410 F.3d 810, 816 (6th Cir.2005) (quoting *Shelby Cnty. Health Care Corp. v. S. Council of Indus. Workers Health & Welfare Trust Fund,* 203 F.3d 926, 931 (6th Cir.2000)); *see also Excel Energy, Inc. v. Cannelton Sales Co.,* 246 Fed.Appx. 953, 959 (6th Cir.2007) (citing *Salehpour v. Univ. of Tenn.,* 159 F.3d 199, 204 (6th Cir.1998)).

*Ringle*, 734 F.3d 585, 590 (6th Cir. 2013) (citing *Cornstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001)).  Here, Plaintiff cannot prove the objective component of his claim.

When considering whether physical force applied by a correctional officer rises to the level of excessive force in violation of the Eighth Amendment, a Court must determine whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.  *Whitley v. Albers*, 475 U.S. 312, 319-21 (1986).   The courts have been careful not to "constitutionalize" every use of force that occurs in a prison setting.  Thus, not "every malevolent touch by a prison guard gives rise to a federal cause of action."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort "'repugnant to the conscience of mankind.'" *Id.* at 9-10, quoting *Whitley,* 475 U.S. at 327 (additional internal quotation marks and citations omitted)."  "The objective component requires the pain inflicted to be 'sufficiently serious.'" *Williams v. Curtin*, 631 F.3d 380, 383 (6th Ci. 2011) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)).

Having reviewed all of the evidence including Plaintiff's own allegations, the video record, and declarations and other exhibits filed by both parties, the undersigned concludes that no reasonable trier of fact could conclude that the force used by Defendant objectively rose to the level of a constitutional violation.  Instead, the force of which Plaintiff complains was brief and *de minimis*.  The *de mimimis* nature of the force employed by the Defendant is corroborated not only by <u>all</u> of the evidence of record, but also by the lack of <u>any</u> physical injury sustained by the Plaintiff.

17

A review of relevant case law confirms that allegations that a correctional officer has "slammed" or "rammed" an inmate into a wall are not uncommon.  When the evidence reflects a genuine issue of material fact concerning the amount of force used, such excessive force claims will elude disposition at the summary judgment stage.  For example, in *Cordell v. McKinney*, 759 F.3d 573 (6th Cir. 2014), the Sixth Circuit reversed a grant of summary judgment where the plaintiff claimed he was rammed into a wall "with force sufficient to lacerate [inmate's] forehead, cause severe neck and back pain," and leave inmate "very, very groggy."  The critical portion of the incident occurred out of the view of a security camera, but a nurse's account and other evidence corroborated that the force was sufficient to cause blood on the floor and the wall.  *Id.* at 584.  The appellate court was troubled both by the absence of video showing "how [the plaintiff] contacted the wall" and the "severity of Cordell's injuries," which were described as "rather significant," including a "whiplash-type injury" to his spine and a cut that required five stitches  *Id.* at 582.  Still, the Sixth Circuit was careful to state that the deputy had a reasonable basis for using "some force" based upon the inmate turning toward him during the escort, since "prison officials may use appropriate force to regain control of an aggressive inmate."  *Id.* at 581- 582; *accord Hammon v. Lapeer County*, 113 F. Supp. 3d 899, 923 (E.D. Mich. 2015) (denying summary judgment where no video evidence existed to contradict plaintiff's account that, unprovoked, a deputy forcefully handcuffed him and ignored his complaints, violently shoved him into elevator wall, forced him to the floor and held a taser to his neck.  Evidence of abrasions, swollen sprained wrists, as well as physician's report of diffuse tenderness over spine, all supported objective component of claim).

18

Unlike *Cordell* and *Hammon*, the security camera footage provided by the Defendant eliminates any genuine dispute of material fact as to the amount of force used, as does the fact that Plaintiff did not suffer so much as even a "de minimis" type of bruise or scrape.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, [we need] not adopt that version of the facts for purposes of ruling on a motion for summary judgment.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

It is worth pointing out that Plaintiff does not allege any injury whatsoever in his complaint.  The only "injury" he alleges is to his liberty interest, insofar as he alleges being forced to wear handcuffs "[against] my own liberty to wear," and being forced to walk at a pace that was in violation of his "own liberty."  Plaintiff argues, however, that "[w]hile the extent of a prisoner's injury may help determine the amount of force used by the prison official; it is not dispositive of whether an Eighth Amendment violation has occurred."  *Cordell*, 750 F.3d at 581 (citing *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010)).  In *Hudson*, the Supreme Court explicitly held that a "significant" injury is not required.  The Court emphasized that the Eighth Amendment excludes "*de minimis* uses of physical force," but that even relatively "minor" injuries such as the bruises, swelling, loosened teeth and cracked dental plate suffered by the plaintiff in that case could support an Eighth Amendment claim.  *Id.* at 10.

The central issue under the Eighth Amendment remains the amount of force used, not the amount of injury.  Nevertheless, in *Wilkins v. Gaddy*, the Supreme Court held that an examination of a plaintiff's injuries remains meaningful:

19

This is not to say that the "absence of serious injury" is irrelevant to the Eighth Amendment inquiry. [*Hudson*, 503 U.S. at 7] "[T]he extent of injury suffered by an inmate is one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation." *Id.* (quoting *Whitley*, 475 U.S. at 321, 106 S. Ct. 1078). The extent of injury may also provide some indication of the amount of force applied. As we stated in *Hudson*, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9, 112 S. Ct. 995. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Ibid.* (some internal quotation marks omitted). An inmate who complains of a "push or shove" that causes no discernible injury almost certainly fails to state a valid excessive force claim. *Ibid.* (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

*Id.* at 37-38.

The record before the undersigned presents a nearly textbook example of an inmate who complains of a "push or shove" that has caused no discernible injury. In addition to failing to so much as allege any injury, the record confirms that Plaintiff suffered no injury as a result of the Defendant placing him against the wall on two occasions (on the stairway and in the corridor), or as a result of the force allegedly used by Defendant "pushing" and/or "rushing" Plaintiff down the hallway during part of the escort. Immediately after the incident, Plaintiff was transported to the prison's medical department, where he was examined by Nurse Teresa Hill at 12:41 p.m. Defendant has submitted the declaration of Nurse Hill as well as a contemporaneous medical exam report. Those records reflect that Plaintiff verbally stated that he was fine, and when asked if he had any injuries or medical concerns, responded in the negative. Nurse Hill conducted a medical examination, but also found no physical injury of any kind. (Doc. 58-1, PageID 255; *see also* Doc. 58-2). Consistent with his complete lack of any

20

physical injury, Plaintiff received no treatment after his examination, but was instead escorted to segregation.

In *Cordell*, the presence of "rather significant" injury provided some support for the allegations of force. In contrast, even though "[i]njury and force…are only imperfectly correlated," *see Wilkins v. Gaddy*, 559 U.S. at 38, the lack of any discernible injury here undermines Plaintiff's allegations that the Defendant forcefully "slammed" or "rammed" him into two walls. *Accord Leary v. Livingston County*, 528 F.3d 438 (6th Cir. 2008) (holding that karate chop to back of pretrial detainee's neck by officer walking detainee to his cell was "*de minimis*" use of force insufficient to state Eighth Amendment claim, given the admitted lack of any injury); *Rogers v. Shostak*, No. 1:14-cv-213, 2015 WL 3604057, at *8-9 (S.D. Ohio June 5, 2015) (granting summary judgment and explaining that even if the Court accepted as true that the inmate was pushed and punched "hard" on his chest, the record reflected that despite his allegations of chest pain, there was "no evidence that plaintiff suffered a chest injury or chest pain of sufficient severity to require any type of medical attention or treatment"); *Gyekye v. Gilliam*, Case No. 2:11-cv-353, 2012 WL 1900927 (S.D. Ohio May 24, 2012) (granting summary judgment to defendant who allegedly slammed inmate into wall while uttering racial slur, based upon contrary evidence in record including the lack of any physical injury consistent with more than *de minimis* use of force).

Any remaining doubt is resolved by reference to the video record and all other exhibits, including those submitted by Plaintiff himself. For example, although Plaintiff alleges that Defendant initiated the verbal conflict, Plaintiff freely admits that while on the K-3 stairwell he responded by calling Defendant Dillow a "bitch" and that he "cussed

21

him out" in close proximity.  (Doc. 10-1, PageID 92).  However reprehensible, an allegation that a correctional officer engaged in name calling does not violate the Eighth Amendment.  By contrast, Plaintiff's admissions provide a basis for a reasonable correctional officer to believe that Plaintiff was threatening, aggressive and/or non-submissive, such that some level of force was reasonably necessary to restore order.

Dillow has submitted a declaration that states that he ordered Plaintiff to stop and turn around on the stairwell so that leg shackles could be attached,[8] but that in response, Plaintiff began "yelling aggressively at me in close proximity."  (Doc. 58-2. PageID 359).  Non-party witness C-O Dalton confirms Defendant's account, (Doc. 58-3, PageID 362), as does Plaintiff himself (to the extent he admits cussing out the Defendant).

The video record of the stairway incident, designated as "517B-15," provides additional evidence contradicting key features of Plaintiff's account.  The video shows an 8-step open stairwell, bounded on one side by a wall.  As Defendant proceeds down the stairwell directly behind Plaintiff, Plaintiff stops on the third step and turns clockwise toward Defendant, while Defendant continues to walk down the stairs, apparently (momentarily) unaware that Plaintiff has stopped in front of him.  (See 517B-15, 11:59:55 a.m.).  Although Plaintiff alleges that Defendant initially "tried to threaten me by pointing towards a camera on the way [saying] he would have pushed me down the stairs if it wasn't for the camera," no such action is recorded.  Rather, close review of the videotape demonstrates that Plaintiff stopped and turned toward Defendant on the

---

[8]The oddity of the timing of the decision to apply leg irons while Plaintiff was still on the stairway is highlighted when viewing the video.  However, the stated reason for pausing on the stairwell is immaterial given the lack of evidence of the objective component of an Eighth Amendment violation.

stairwell before any force was employed. After Plaintiff stops, Defendant follows suit and stops on the step above Plaintiff. Defendant turns to face Plaintiff, leaning slightly toward Plaintiff and pointing his right index finger within an inch or two of Plaintiff's face, while speaking for approximately 3-4 seconds. There is no audio record of the words spoken.

After the few seconds of inaudible speech, at 12:00:00, Defendant begins to move his right arm toward Plaintiff's right shoulder. After a 5 second gap in time,[9] the video captures the Defendant using one outstretched hand to physically push Plaintiff counterclockwise to turn him around. For the next five seconds, from 12:00:05 to 12:00:10, the video reflects a very fluid situation in which neither Defendant nor Plaintiff appears to be fully in control of his movements. Plaintiff continues turning and partially loses his balance while doing so, while Defendant simultaneously attempts to maneuver behind Plaintiff in order to regain physical control of his charge. During these few seconds of chaotic movement, both parties briefly descend to the bottom of the stairs and re-ascend 2-3 steps. At 12:00:07, as Defendant reaches for Plaintiff with both hands to gain control, the two men exchange positions on the stairwell, with Defendant ending up on the stair directly below Plaintiff. At 12:00:08, during Plaintiff's turn and partial loss of balance, with Defendant still attempting to regain physical control, Plaintiff

---

[9]There is a gap in the video record from 12:00:00 until 12:00:05, during which the parties do not appear to have moved from their positions. The technical basis for the 4-5 second gap has been explained by an affidavit offered by Defendant. (Doc. 58-7). While Plaintiff disputes the Defendant's technical explanation, the undersigned concludes that the gap is not material. Plaintiff alleges only one interaction that occurred on the stairwell in which he alleges that Defendant "rammed" him against the wall and pushed and/or "rushed" Plaintiff down the stairs. The entirety of the actions about which Plaintiff complains are fully reflected in the video.

contacts the stairway wall for a fraction of a second before regaining his balance and standing upright again.[10]

By 12:00:10, Plaintiff is once again fully erect on the stairwell and again turns briefly towards the Defendant, engaging in further verbal (though inaudible) remarks. By 12:00:13, the Plaintiff again has his back to the Defendant with the Defendant directly behind him. At this point in time Defendant attests that he applied leg irons. (Doc. 58-2). An approximately 6-second gap ensues with the videotape picking back up at 12:00:19.[11] No significant change in the parties' positions occurs during that 6-second interval, (12:00:13 to 12:00:19), and Plaintiff does not allege any further force was employed on the stairs, other than rushing him down the last few stairs. The video reflects Defendant using one arm to physically direct Plaintiff back down the last three stairs towards the hallway.

The Court also has before it the video record of the second incident of which Plaintiff complains, which occurred while Defendant and Plaintiff walking down the hallway of the "K corridor." (*See* video file "517-15"). The portion that portrays Plaintiff is located on the video from 2:15 until 3:19. Although Plaintiff argues that this video may not depict him, the undersigned is satisfied from Defendant's verification and from a review of the subject video that it is accurate[12]

---

[10]Defendant affirmatively responded "yes" to Plaintiff's interrogatory concerning whether Defendant "place[d] [Plaintiff against] the wall on the 3rd step on unit K-3 on 11-24-15?"

[11]The technical explanation for both time gaps is that the camera was set to a "sensitivity level…too low to detect only movement of Correctional Officer Mike Dillow's lips," meaning that the camera momentarily turned off when it did not detect physical body movement. (Doc. 58-7, PageID 379).

[12]Plaintiff has filed a separate motion *in limine* disputing that this video depicts him, arguing in part that the time stamp "from 2:15 until 3:19" is incompatible with Plaintiff being "locked in his cell 23 hours a day." (Doc. 69, PageID 467). Plaintiff has confused the referenced time as a reference to hours rather than minutes and seconds. The time from 2:15 until 3:19 references a video sequence that lasts 1 minute and

Plaintiff and Defendant first appear in the hallway at approximately 2:34 on the record.  Six seconds later, Defendant is observed using both arms to turn and push Plaintiff to face the right-hand wall. The two men stand in that position with no change in position, and no other force used by Defendant other than continuing to hold Plaintiff against the wall, for approximately 12-13 seconds.  At that time, Defendant releases Plaintiff from the wall and resumes the escort, disappearing from the camera's view at the end of the hallway.  Defendant states that he placed Plaintiff against the hallway wall due to Plaintiff continuing "his loud aggressive shouting and appear[ing] to turn his body towards me," and Plaintiff's disregard of Defendant's verbal order to "cease his behavior and …continue moving his body only in the direction in which I escorted him." (Doc. 58-2 at ¶8, PageID 359).  Plaintiff does not deny the verbal engagement, but argues that there was no need for Defendant to shove him against the wall because Plaintiff was already in handcuffs and leg shackles.  Plaintiff also complains that Defendant used threatening language.

Plaintiff complains that the Warden refused to investigate and refused to assign Plaintiff's case to a Use of Force Committee.  However, Defendant has submitted the affidavit of the Deputy Warden of Operations, William Cool, who states that he created and/or reviewed a "use of force" record but concluded "that the incident did not need to be referred to a Use of Force Committee."  (Doc. 58-4).  Deputy Warden Cool states

4 seconds, which begins 2 minutes and 15 seconds into the beginning of the more than 8-minute video identified as 517-15 that was submitted to the Court.  The time stamp on the video is consistent with all other video clips submitted to this Court, and reflects Plaintiff's first appearance in the K-hallway at 12:00:22 on 11/24/15.  Plaintiff also argues that as a high-security "4-B" inmate he is required to wear orange pants and an orange and white shirt, "so [there's] no telling who is this mystery person."  (*Id.* at PageID 468).  In addition to the time stamp matching the date and time of the incident at issue, the inmate depicted on the video matches Plaintiff's description.

that he "determined that Sergeant Michael Dillow used only the force necessary in the circumstance" in compliance with Ohio law. (*Id.* at ¶6, PageID 365).  A "Deputy Warden of Operations Review of Use of Force" form attached as an additional exhibit reflects that the force used was considered to be both in self-defense by Dillow and as a method for "[c]ontrolling or subduing an inmate who refuses to obey prison rules."  The type of force used is indicated as a "struggle[] with an inmate, pushed an inmate or exerted physical restraint or control."  (*Id.* at PageID 367).  Warden Erdos signed off in agreement with the conclusion that no further action was required.  Related documents consistently reflect the same facts and conclusion by all reviewing officials that no further action or referral to a Use of Force Committee was needed.  (Doc. 58-4).

As with the first incident on the stairwell, the undersigned concludes as a matter of law that the objective component of the Eighth Amendment was not violated by the Defendant's use of force in placing Plaintiff against the wall of the K-corridor, or by any perceived "shoving" (which is subtle enough that it is not apparent on the video) by Defendant's placement of his arm on Plaintiff at times during the escort down the hallway.  Summary judgment should be granted to the Defendant because there is no genuine issue of material fact that the level of force used did not amount to "cruel and unusual punishments" in violation of the Eighth Amendment.  *See Jones Bey v. Johnson*, 248 Fed. Appx. 675, 677 (6th Cir. 2007) (holding that cuts and bruises resulting from disciplinary handcuffing were *de minimis*); *Easley v. Little*, Case No. 1:14-cv-891 (S.D. Ohio June 28, 2016), granting summary judgment to Defendants after concluding that amount of force was *de minimis* in light of video evidence and relatively minor nature of inmate's injuries); *Iacovane v. Wilkinson*, No. 2:03-cv-652, 2007 WL

490160 (S.D. Ohio 2007) (granting summary judgment to defendants who pushed plaintiff's head into cell wall, based upon video that allowed Court to "easily conclude[] that defendants did not use unnecessary and wanton force," but instead that force was *de minimis*).

### IV.    Conclusions and Recommendations

For the reasons stated, **IT IS RECOMMENDED THAT**:

1. Defendant's motion for summary judgment (Doc. 59) should be GRANTED as to the retaliation claim based upon Plaintiff's failure to exhaust, but denied as to the excessive force claim due to Plaintiff's exhaustion of that claim;

2. Notwithstanding the denial of judgment based upon a failure to exhaust, Defendant's construed motion for summary judgment on the merits of the excessive force claim (Doc. 58) should be GRANTED;

3. Based upon the recommended grant of judgment in favor of the Defendant on both retaliation and excessive force claims, Plaintiff's motions for summary judgment (Docs. 34, 36) should be DENIED;

4. To the extent that the declarations referenced in Plaintiff's motion for leave to file declaratory evidence and motion to submit declaration evidence in opposition (Docs. 65, 67) have been considered herein, those motions should be GRANTED.

5. All remaining pending motions filed by Plaintiff should be DENIED AS MOOT in light of the recommended rulings herein, and this case should be CLOSED.

 *s/ Stephanie K. Bowman*
Stephanie K. Bowman
United States Magistrate Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

ULIOUS BROOKS,

          Plaintiff,

    v.

SGT MIKE DILLOW, et al.,

          Defendants.

Case No. 1:15-cv-812
Black, J.
Bowman, M.J.

**NOTICE**

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to this Report and Recommendation ("R&R") within **FOURTEEN  (14) DAYS** of the filing date of this R&R.  That period may be extended further by the Court on timely motion by either side for an extension of time.  All objections shall specify the portion(s) of the R&R objected to, and shall be accompanied by a memorandum of law in support of the objections.  A party shall respond to an opponent's objections within **FOURTEEN (14) DAYS** after being served with a copy of those objections.  Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).